Filed 2/24/21  P. v. Serrano CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E073692 |
| v. | (Super.Ct.No. FSB17001202) |
| JULIO CESAR SERRANO, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  J. David Mazurek, Judge.  Affirmed.

Sharon G. Wrubel, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Annie Featherman Fraser, Deputy Attorneys General, for Plaintiff and Respondent.

1

# I. INTRODUCTION

A jury found defendant and appellant Julio Cesar Serrano guilty as charged of the first degree, willful, deliberate, and premeditated murder of M. Garcia, on or about March 25-26, 2017 (Pen. Code, §§ 187, subd. (a), 189),[1] and further found that defendant personally used a knife in the commission of the murder (§ 12022, subd. (b)(1)).  In a subsequent, sanity phase of the trial, the jury found that defendant was not legally insane at the time of the murder.  In a bifurcated trial, the court found that defendant had two prior strikes.  (§ 667, subds. (b)-(i).)  Defendant was sentenced to 51 years to life in prison:  25 years to life for the murder, doubled to 50 years to life based on the prior strikes, plus one year for the personal use enhancement.

Regarding the guilt phase of the trial, defendant claims:  (1) insufficient evidence shows that the murder was deliberate and premeditated, and (2) the prosecutor erred by speculating during closing argument that defendant premediated the murder by "taking time" to retrieve the knife he used to kill Garcia.  As we explain, substantial evidence shows that the murder was deliberate and premeditated.  We also conclude that the challenged portion of the prosecutor's argument was not based on speculation.  Rather, it was based on a reasonable inference that defendant premeditated the murder by reflecting on it between the time that he physically beat Garcia, causing numerous bruises on her face and body, to when he grabbed a knife and stabbed her multiple times, including twice fatally.

---

[1] Undesignated statutory references are to the Penal Code.

Regarding the sanity phase of the trial, defendant claims the trial court abused its discretion in allowing the expert witnesses to be questioned concerning (1) whether they considered defendant's 2001 conviction for misdemeanor domestic violence in investigating the case and in assessing defendant's credibility; and (2) whether they relied on information, contained in reports, that defendant *may have* perpetrated prior acts of domestic violence against Garcia. Defendant further claims that the cumulative effect of these two errors was prejudicial. We find no merit to any of these claims.

Thus, we affirm the judgment in all respects.

## II. GUILT PHASE EVIDENCE

A. *Events Preceding the Murder*

In December 2016, defendant and his girlfriend, Garcia, began living together in a trailer located behind a duplex in San Bernardino. Defendant and Garcia had worked together. Garcia moved out of the trailer around March 8, 2017, stayed with a coworker for nine days, then told her coworker that she was going to rent a room in a house. After Garcia moved out of the trailer, a neighbor saw Garcia at the trailer from time to time, including around March 23.

Defendant's sister, Ms. P., was living in Los Angeles with her husband, Mr. P., her mother, and other family members. Defendant would visit the P.'s home every weekend, and Garcia would sometimes accompany defendant. Defendant did not have a car, and Garcia would sometimes drive defendant to the P.'s home. Defendant was at the P.'s home, without Garcia, on March 25, 2017, until Garcia arrived and picked him up in her car. Ms. P. saw that defendant looked "agitated" and "bothered" during his March 25

3

visit, as if he did not "feel good" "mentally," but he did not mention that he did not feel well.

Defendant was on parole in 2017 and met with his parole officer at least once each month. During a meeting with his parole officer before the murder, defendant said he was "quite upset and not happy" because he had recently discovered that Garcia was married to her first cousin in Mexico.[2] As a result, he thought his marriage to Garcia[3] was a sham and invalid.

During the meeting, defendant told his parole officer he was depressed about the situation with Garcia and was concerned about how he was feeling. He said he had kicked Garcia out of the trailer and no longer wanted anything to do with her, but she was still coming to the trailer and talking to him. Because he was on parole and "knew" he would go to jail "if something happened," he wanted his parole officer to know that he was no longer with Garcia. The parole officer advised defendant not to open the door and to call the police if Garcia came to the trailer. The parole officer also had defendant speak with a parole department social worker, and defendant was referred to the "parole outpatient clinic" for an evaluation.

---

[2] In closing argument, the prosecutor argued that this meeting between defendant and his parole officer occurred three days before the murder. Although the guilt phase evidence indicates that the meeting occurred before the March 25-26, 2017 murder, and after Garcia move out of the trailer on March 8, the guilt phase evidence does not show that the meeting occurred three days before the murder. During the sanity phase, the parole officer testified that the meeting occurred on March 13, which was 12 or 13 days before the murder.

[3] There was no evidence that defendant and Garcia were married.

As a "high risk" parolee, defendant wore a GPS ankle monitor to track his movements. The ankle monitor showed that defendant arrived at his trailer at 8:19 p.m. on March 25, 2017, and did not leave until 12:02 p.m. on March 26. Sometime during that period, defendant beat Garcia and stabbed her to death with a large kitchen knife inside the trailer. Neighbors did not see or hear any fighting or arguing coming from inside or around the trailer on March 25 to 26, or any earlier time.

B. *Defendant's Actions, Statements, and Injuries Following the Murder*

On March 26, 2017, defendant drove Garcia's car to the P.'s home in Los Angeles and, according to his ankle monitor, arrived at 1:21 p.m. His hands were wrapped in a sack cloth, he was in a rush, and he asked to use the bathroom. He wanted to see his mother, and when Mr. P. asked him, "What happened?" he said he had "messed up" and "hit" Garcia. Mr. P. asked defendant "how bad" it was, and defendant said it was "pretty bad."

Defendant was "anxious," in contrast to his usual demeanor, which was "more mellow, more calm." He did not want to talk to Mr. P. and said that he wanted to see his mother. After defendant visited with his mother, Mr. P. asked defendant for more details about Garcia. Defendant said that Garcia was "at home," that he had stabbed her, he wanted to hurt himself, and he wanted to go to the hospital. Mr. P. then drove defendant to the hospital.

On the way to the hospital, defendant told Mr. P. that he did not know whether Garcia was alive or dead. Mr. P. asked defendant whether he was sure he wanted to go the hospital, rather than "flee somewhere else, maybe Mexico," because he would be

arrested if he went to the hospital. Defendant said he knew he would be arrested, he did not want to hurt anyone else, he wanted to hurt himself, and he wanted to go to the hospital and turn himself into the police.

Defendant also told Mr. P. that he had asked Garcia to leave the trailer several times, but she would not leave, and she "kept pressing" him. An altercation ensued. He pushed Garcia to the floor, and she struck her head. Then he said he knew that Garcia was dead because he had stabbed her in her neck and body, and there was a lot of blood.

After he took defendant to the hospital, Mr. P. called Ms. P. and told her to call 911 because Garcia might still be alive. Ms. P. called 911 and asked them to perform a welfare check on Garcia at the trailer.

Two Los Angeles police officers responded to the hospital, spoke to defendant, and recorded the conversation with a body camera. Defendant was "very calm" and "cooperative." He was not confused and appeared to understand the officers' questions. While defendant was speaking to the officers, the manager of the trailer called, and defendant said that the manager was probably calling "because of what I did."

Defendant was wearing his ankle monitor, told the officers that he was on parole, and that he had been out of prison for 11 months. When asked what it was like being in prison, defendant said, "I fuckin hated that place. Look at me now, I got to spend the rest of my life in there. I told, I kept telling the people, hey look at, I'm hearing voices, I'm fuckin, every psychologist, psychiatrist, psychologist, I'm hearing voices hurting, telling me to hurt myself and kill, kill somebody. Oh, take this fucking medication and, and

6

you'll feel better." When asked whether the medication had helped, defendant responded, "No, look what I did."

Defendant had abrasions on each of his knuckles, and his fingers were swollen and red. He received around six stitches for a cut on his hand that was about one-half inch deep and one-half inch wide. The hand injury was consistent with being cut by a slippery knife handle, which can occur if the handle is bloody. Defendant also had scratches on his legs, and an abrasion and swelling on his knee. There was dried blood on his arm, elbow, and shoes, and he complained of pain to his ankle.

C. *The Murder Scene*

Around 2:00 p.m., on March 26, 2017, San Bernardino police officers arrived at defendant's trailer. The door to the trailer was closed but unlocked. When the officers opened the door, they immediately noticed large amounts of blood on the floor. Garcia's body was on the floor, covered by a blanket except for her feet. The blanket was saturated with blood, but Garcia was not "active[ly] bleeding," and some of the blood on the floor was dry, indicating that Garcia had been dead for some time. A large kitchen knife—a 12-inch butcher knife—was "sticking out" of, or impaled in, Garcia's neck. The handle of the knife was bent where it connected to the blade, indicating that it stopped when it struck something hard.

Although there was a lot of blood inside the trailer, there was no blood on the steps outside the trailer or outside the door. There was blood on the kitchen counter and sink, bloody shoeprints on the floor throughout the trailer, a bloodstain on the bathroom floor, a bloody washcloth on the back lid of the toilet, a bloody towel on the mattress in

the bedroom, and another bloody towel beneath the blanket covering Garcia.  A pair of flip-flop sandals found in the trailer matched the bloody footprints throughout the trailer. A shirt and pair of men's underwear were found near Garcia's head.  Defendant's DNA was found on the knife stuck in Garcia's neck and on Garcia's fingernails.

D. *Garcia's Injuries*

Garcia had sharp and blunt force injuries all over her body.  There were slashing and stab wounds on her face, including on her cheeks, the bridge of her nose, on her nostril, one that went through her lip, and one that went under her chin and through to her tooth.  Garcia also had defensive wounds, including sharp force injuries and bruises on her arm, elbow, hand and fingertips, and a slashing stab wound on the web of her left hand, between her index finger and thumb, which almost severed her thumb.  The sharp force injury on Garcia's left hand was consistent with her reaching up to try to block knife blows.  Garcia had superficial sharp force injuries on her lower chest and abdomen.

Garcia also had bruises all over her body, some from blunt force trauma, including bruising and swelling around her eyes, on the side of her face, and on her hands, arms, and legs.  She wore dentures, her front teeth were missing from her dentures, and her acrylic fingernails were partially broken.  Her autopsy revealed that she had internal bruising, a hematoma, beneath her scalp and on the right side of her head, which could have been caused from a fall or from being struck in the head.

Garcia's fatal injuries consisted of two stab wounds from the knife left stuck in her neck.  One of the fatal stab wounds entered her back and pierced her lung, causing it to

8

collapse and causing internal bleeding in her chest cavity. The other fatal stab wound was the neck wound, which was angled upward and cut her carotid artery.

According to the forensic pathologist who performed Garcia's autopsy, Garcia died in a "matter of minutes" from her two fatal stab wounds. Although the fatal stab wound to her back must have been inflicted before her fatal neck wound, there was no "major delay" between the two fatal injuries. There was "every reason to think" that all of Garcia's sharp force injuries happened close together in time, and that all of her defensive injuries, including all of her sharp and blunt force defensive injuries, could have been inflicted after she was stabbed in the back and lying on the floor. Her precise time of death could not be determined.

### III. DISCUSSION/GUILT PHASE ISSUES

A. *Substantial Evidence Shows the Murder Was Deliberate and Premeditated*

Defendant claims his first degree murder conviction must be reversed because insufficient evidence shows that the murder was premeditated and deliberate. We disagree. As we explain, substantial evidence shows, and the jury reasonably concluded, that the murder was premeditated and deliberate.

1. Relevant Background

The prosecution's sole theory in support of the first degree murder charge was that the murder was willful, deliberate, and premeditated. (§§ 187, subd. (a), 189.) The jury was instructed on homicide; first and second degree murder; willful, deliberate, and premediated first degree murder; provocation possibly reducing a first degree murder to

9

second degree murder or to voluntary manslaughter; and voluntary manslaughter based on a sudden quarrel or heat of passion.  (CALCRIM Nos. 500, 520, 521, 522, 570.)

During closing argument, the defense conceded that defendant killed Garcia and that the homicide was willful.  The defense argued, however, that defendant was only guilty of voluntary manslaughter, not murder, because the evidence showed that he killed Garcia in a sudden quarrel or heat of passion.  The defense alternatively argued that defendant was at most guilty of second degree murder because insufficient evidence showed that the homicide was deliberate or premeditated.

2.  Standard of Review

In reviewing a claim that insufficient evidence supports a criminal conviction, we review the entire record in the light most favorable to the judgment in order to determine whether it contains substantial evidence—evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could have found the defendant guilty of the crime beyond a reasonable doubt.  (*People v. Johnson* (1980) 26 Cal.3d 557, 576-578.)  Substantial evidence has been defined as evidence that "maintains its credibility and inspires confidence that the ultimate fact it addresses has been justly determined." (*People v. Conner* (1983) 34 Cal.3d. 141, 149.)  It is the responsibility of the trier of fact to resolve conflicts in testimony, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts.  (*People v. Boatman* (2013) 221 Cal.App.4th 1253, 1262 (*Boatman*).)  Thus, in reviewing the record for substantial evidence, we do not resolve conflicts in the evidence or reweigh the evidence; rather, we presume in support

10

of the judgment the existence of every fact that the trier of fact could have reasonably deduced from the evidence. (*People v. Kraft* (2000) 23 Cal.4th 978, 1036.)

The same standard of review applies when the criminal conviction rests primarily on circumstantial evidence. (*People v. Perez* (1992) 2 Cal.4th 1117, 1124 (*Perez*).) "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible to two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment." ' " (*People v. Bean* (1988) 46 Cal.3d 919, 932-933.)

3. Applicable Legal Principles

" 'All murder which is perpetrated by any kind of willful, deliberate and premediated killing with express malice aforethought is murder of the first degree.' " (*Perez, supra*, 2 Cal.4th at p. 1123.) Express malice exists when there is a deliberate intention to unlawfully take away the life of another human being. (§ 188.) In the first degree murder context, "willful" means intentional. (*Perez*, at p. 1123.) At trial, defendant conceded that he intentionally and willfully killed Garcia. Thus, our discussion is limited to whether substantial evidence shows that the murder was premediated and deliberate.

In the first degree murder context, " ' "premediated" ' " means " 'considered beforehand,' " and " ' "deliberate" ' " means " 'formed or arrived at or determined upon

11

as a result of careful thought and weighing of considerations for and against the proposed course of action.' " (*People v. Lee* (2011) 51 Cal.4th 620, 636 (*Lee*).) "Premeditation and deliberation require 'substantially more reflection; i.e., more understanding and comprehension of the character of the act than the mere amount of thought necessary to form the intent to kill.' " (*People. v. Van Ronk* (1985) 171 Cal.App.3d 818, 823.) But the process of premeditation and deliberation does not require any extended period of time. (*Lee*, at p. 636.) " ' "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly." ' " (*Ibid*.) A "preexisting reflection, of any duration," distinguishes first degree premediated and deliberate murder from second degree murder. (*People v. Solomon* (2010) 49 Cal.4th 792, 813; *Boatman*, *supra*, 221 Cal.App.4th at pp. 1264-1265 [accord].)

In *People v. Anderson* (1968) 70 Cal.2d 15 (*Anderson*), our Supreme Court discussed the use of circumstantial evidence to prove first degree murder based on premeditation and deliberation and the need to distinguish permissible inferences from speculation in relying on such circumstantial evidence. (*Id*. at pp. 25-26.) The court stated: "Given the presumption that an unjustified killing of a human being constitutes murder of the second, rather than of the first, degree, and the clear legislative intention to differentiate between first and second degree murder, [a reviewing court] must determine in any case of circumstantial evidence whether the proof is such as will furnish a *reasonable foundation* for an inference of premeditation and deliberation [citation], or whether it 'leaves only to *conjecture and surmise* the conclusion that [the] defendant

12

either arrived at or carried out the intention to kill as the result of a concurrence of deliberation and premeditation.' " (*Id*. at p. 25)

The *Anderson* court identified three categories of evidence relevant to resolving the issue of premeditation and deliberation in cases based on circumstantial evidence: (1) planning activity, (2) motive, and (3) manner of killing. (*Anderson*, *supra*, 70 Cal.2d at pp. 26-27.) But these factors are neither exclusive, nor invariably determinative, of the question of premeditation and deliberation. (*Lee*, *supra*, 51 Cal.4th at p. 636.) " ' " '*Anderson* was simply intended to guide an appellate court's assessment whether the evidence supports an inference that the killing occurred as the result of preexisting reflection rather than unconsidered or rash impulse.' " ' " (*Ibid.*)

4. Analysis

Here, substantial evidence shows that defendant acted with premeditation and deliberation when he stabbed and killed Garcia. Two of the *Anderson* factors—motive and the manner of the killing—support the jury's finding, implicit in its guilty verdict on the first degree murder charge, that the murder was premediated and deliberate.

First, the record supports a reasonable inference that defendant had a motive to kill Garcia, and that he was very angry with Garcia, only several days or weeks before the murder took place on March 25 to 26, 2017. Sometime before March 25 to 26, but after Garcia had moved out of defendant's trailer on March 8, defendant met with his parole officer and expressed that he was "quite upset and not happy" because he had recently discovered that Garcia was married to her first cousin in Mexico and, as a result, he thought his marriage to Garcia was a "sham" and invalid. He told his parole officer that

13

he no longer wanted anything to do with Garcia, but she kept coming to the trailer and talking to him. He was concerned that he would go to jail if "something happened" between him and Garcia. He said he was depressed about the situation and concerned about how he was feeling about it. On March 26, shortly after the murder, he told Mr. P. that Garcia had been "pushing" and "pressing" him, and that she would not leave the trailer after he had asked her to leave.

Second, the manner in which the killing occurred also shows that defendant acted with premeditation and deliberation when he stabbed and killed Garcia. Garcia had numerous bruises all over her body, including some from blunt force trauma, including bruising and swelling around her eyes, on the side of her face, and on her hands, arm, and legs. She also had numerous sharp force injuries all over her body, including the two fatal stab wounds to her back and neck. Defendant admitted that he pushed Garcia to the floor and that he "hit" and "stabbed" her, although he did not explain the sequence in which the beating and stabbings occurred or how long the entire assault lasted.

But based on the numerous bruises on Garcia's face and body, the abrasions on defendant's knuckles, and the redness and swelling on defendant's fingers, the jury could have reasonably inferred that defendant extensively beat Garcia with his fists, and that the beating did not happen quickly but continued over some period of time. The jury also could have reasonably inferred that, during the beating, defendant pushed Garcia to the floor, causing the internal bruising or hematoma beneath her scalp, before she got up from the floor and he stabbed her in her back.

14

In addition, the jury could have reasonably inferred that, during or after defendant beat Garcia with his fists, but before he grabbed the knife, he consciously considered whether to escalate the beating by grabbing the knife and killing Garcia. It is reasonable to infer that defendant did not have the knife while he was pummeling Garcia with his fists for a significant period of time. Holding the knife while beating Garcia so extensively would have been awkward at best. After reflecting on the matter, he grabbed the knife, probably from the nearby kitchen area of the small trailer, and stabbed Garcia in the back, causing her first fatal injury. Then, after Garcia fell to the floor a second time, with a fatal stab wound to her back, and lay face-up on the floor trying to defend herself, defendant slashed at Garcia with the knife, causing the numerous sharp force injuries on her face, arms, elbow, fingertips, and left hand. Finally, and to make sure she would die, defendant plunged the knife into Garcia's neck, causing her second fatal injury.

The prosecutor's argument focused on the evidence that defendant had ample time, either during or after the time he beat Garcia with his fists, to consider whether to escalate the beating and stab her to death: "We know from the fact that he took the time to inflict those serious blunt force injuries that it was a protracted struggle, something that went on for some period of time, which allows somebody to make a conscious decision. Is two black eyes enough? Is a swollen face enough? Is it enough that she's down on the ground and she has a head injury that's sufficient enough to cause that hematoma that we saw? Nope. He chose to go for that knife. He chose to escalate it to another step. That gives him the time to make that deliberative result of thinking through what he's doing,

15

choosing to do it anyway. [¶] It's in the selection of the weapon, where exactly he stabbed her, not just flailing around. Those intentional decisions show he meant to kill [Garcia]. [¶] Premediated is, to an extent, the easiest one. Did he make the decision before he did the act? And if you're looking at the final act of the knife to the throat, at any of those times along where he had all of these opportunities to continue his actions, as long as he formed that intent before that final stab to the neck, you have premeditation." The prosecutor's argument reflected the forensic pathologist's testimony that Garcia's two fatal stab wounds occurred close together in time, and that all of her defensive injuries—her sharp and blunt force defensive injuries—could have been inflicted as she lay on the floor, trying to defend herself from defendant.

Defendant argues that none of the *Anderson* factors support a reasonable inference of premeditation and deliberation. Rather, he argues that the entire record shows he acted rashly and impulsively when he killed Garcia. We disagree.

To be sure, and as defendant points out, there is no evidence that defendant engaged in "planning activity" before the murder. That is, there is no evidence that, before the murder, defendant "engaged in activity directed toward, and explicable as intended to result in, the killing." (*Anderson*, *supra*, 70 Cal.2d at p. 26.) But the absence of "planning activity" is not dispositive of whether defendant acted with premeditation and deliberation when he stabbed Garcia to death. (*Lee*, *supra*, 51 Cal.4th at p. 636.) As discussed, the record supports a reasonable inference that defendant had a motive to kill Garcia, and was very angry with Garcia, only days or weeks before the murder. The

16

manner of the killing also supports a reasonable inference that defendant acted with premeditation and deliberation when he stabbed and killed Garcia.

In support of his claim that the murder must have occurred rashly and without premeditation or deliberation, defendant points to the evidence that he told his brother-in-law, Mr. P., that he had asked Garcia to leave his trailer several times on March 25 to 26, 2017, but she refused to leave and kept "pushing" and "pressing" him. He also relies on the meeting he had with his parole officer, days or weeks before the murder, in which he said he had kicked Garcia out of his trailer, he no longer wanted anything to do with her, and he was concerned about how he was feeling about the situation with Garcia. He argues that this evidence and his actions and statements following the murder show that he did not want anything violent to happen with Garcia, and that he was concerned he would lose control of himself around Garcia.

Although the record reasonably supports these inferences, the jury nonetheless could have reasonably concluded that defendant had a motive to kill Garcia and wanted to kill her, and that he premeditated and deliberated the killing, either days or weeks before the killing, or very shortly before the killing when he grabbed the knife and stabbed Garcia to death inside his trailer. The record shows that defendant disregarded his parole officer's advice to stay away from Garcia because she picked him up from the P.'s home during the evening of March 25, 2017, only hours before the murder occurred on March 25 to 26. Defendant's actions and statements following the murder, though consistent with his having acted rashly and impulsively in committing the murder, are also consistent with his having premediated and deliberated the murder.

17

Defendant also points out the knife he used to kill Garcia was "readily available" to him because the trailer was small, and its kitchen area was not "walled off" from where Garcia's body was found on the floor of the trailer. But even though the knife may have been readily available to defendant, the jury could have reasonably concluded that defendant had ample time to weigh the considerations for and against killing Garcia and, in fact, weigh those considerations after he beat Garcia with his fists but before he grabbed the knife from the kitchen area and stabbed Garcia to death with it. This is not negated by the fact that the knife may have been nearby.

Defendant maintains that the manner of the killing was not "so particular and exacting that [he] must have intentionally killed according to a 'preconceived design' to take his victim's life." (*Anderson*, *supra*, 70 Cal.2d at p. 27.) He points out that "the brutality of a killing cannot in itself support a finding that the killer acted with premeditation and deliberation" (*id*. at p. 24) and, "[a]bsent other evidence, a brutal manner of killing is as consistent with a sudden, random 'explosion' of violence as with calculated murder." (*People v Alcala* (1984) 36 Cal.3d 604, 626.)

But as we have explained, the manner of the killing—and the time it must have taken defendant to beat Garcia with his fists before he grabbed the knife and stabbed her to death—supports a reasonable inference that defendant reflected on and considered whether to stab and kill Garcia no later than during, or shortly after, he beat Garcia extensively with his fists. The evidence that defendant had a motive to kill Garcia, was very angry with Garcia prior to the killing, and acted in a manner that reflected a decision to escalate the level of deadly force, also supports a reasonable inference that defendant

18

acted with premeditation and deliberation. (*People v. Williams* (2018) 23 Cal.App.5th 396, 410-411 [Premeditated murder conviction was affirmed based on the manner of killing coupled with evidence of a motive to kill, even though "there was not a great deal of evidence of planning . . . ."].)

Lastly, defendant argues that his actions and statements following the murder are inconsistent with the jury's conclusion that he acted with premeditation and deliberation. For example, he made no attempt to hide the murder scene, he did not attempt to flee from the United States following the murder, and he "expressed dismay over his actions" when he spoke to the police after the murder. But these and defendant's other actions and statements following the murder support a reasonable inference that defendant knew and understood that he had just killed Garcia willfully and with premeditation and deliberation, as he feared he might do during the days and weeks preceding the murder and after he discovered that Garcia was married to her cousin. After the murder, he said he did not want to hurt anyone else, he said good-bye to his mother, and he wanted to go to the hospital and turn himself in. Based on the entire record, the jury reasonably concluded that defendant acted with premeditation and deliberation when he stabbed and killed Garcia in his trailer. Thus, substantial evidence supports defendant's first degree murder conviction.

B. *The Prosecutor's Closing Argument Was Not Based on Speculation*

Defendant next claims that his first degree murder conviction must be reversed based on prosecutorial error during closing argument. He claims that the prosecutor improperly asked the jury to speculate that he took some time to grab the knife he used to

stab Garcia.  We disagree that the prosecutor's argument was based on speculation.  It was based on a reasonable inference that defendant took time to retrieve the knife from the kitchen area of the trailer after he beat Garcia with his fists and considered whether to stab her to death.

    1.  Relevant Background

Defense counsel twice objected when the prosecutor argued during closing that defendant's actions showed he stabbed Garcia with the express intent to kill her.  During this portion of the prosecutor's argument, the following occurred:

"[THE PROSECUTOR]:  We know it's here in this case because of the beating that escalated.  The injury to the head of the hematoma.  The fact at some point beating her wasn't good enough anymore and he took the time to get a knife.  It doesn't matter if you reach back—it's a small trailer—and the knife is handy, or you stop the beating and get a knife and come back.  I would submit that evidence suggests he likely had to go get the knife rather than if it was handy.

"[DEFENSE COUNSEL]:  Objection.  Assumes facts not at all in evidence.

"THE COURT:  Sustained.

"[DEFENSE COUNSEL]:  Move to strike.

"THE COURT:  Stricken.

"[THE PROSECUTOR]:  The evidence in this case shows that she was stabbed initially in the back.  If they had been in a brawl already and he just grabbed it [the knife], it would suggest that she was stabbed from the front.  *The fact that she was stabbed from the back suggests that there was more time taken to get that knife rather than just quickly.*

20

"[DEFENSE COUNSEL]:  Same objection, your honor.

"THE COURT:  Overruled.

"[THE PROSECUTOR]:  And the knife he chose is significant.  He didn't choose a little paring knife.  He chose a 12-inch butcher knife.  He drove it into her back, puncturing and collapsing her lung, and then continued to stab her, at a minimum, of six separate times while she fought back before he lodged that knife in her throat.  [¶]  It is the combination of these actions and even some of them individually that the choice of the back and the throat that show [*sic*] he had that express intent to kill [Garcia]."  (Italics added.)

### 2.  Applicable Law and Analysis

"The prosecution is given wide latitude during closing argument to vigorously argue its case and to comment fairly on the evidence, including by drawing reasonable inferences from it."  (*Lee*, *supra*, 51 Cal.4th at p. 647.)  But "it is 'clearly misconduct' [or, more aptly, error] for a prosecutor to make arguments based on facts not in evidence. . . ."  (*People v. Zurinaga* (2007) 148 Cal.App.4th 1248, 1259; *People v. Tafoya* (2007) 42 Cal.4th 147, 181; *People v. Hill* (1998) 17 Cal.4th 800, 819 & 823, fn. 1.)  Thus, it is error for a prosecutor to base an argument on speculation, rather than evidence.  (*People v. Williams* (1971) 22 Cal.App.3d 34, 49.)

We evaluate claims of prosecutorial error under the following standards:  "A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process.  Conduct by a prosecutor that does not render a criminal trial fundamentally

21

unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury. Furthermore, and particularly pertinent here, when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Morales* (2001) 25 Cal.4th 34, 44 (*Morales*).)

Defendant claims the trial court erroneously overruled his objection to the prosecutor's argument, when the prosecutor stated, "*The fact that she was stabbed from the back suggests that there was more time taken to get that knife rather than just quickly.*" (Italics added.) He claims there was "no evidence the knife was not readily available in the small trailer's kitchen area, where the attack, or part of it, likely occurred," given that the kitchen area was not walled off from where Garcia's body was found on the floor, between the dinette area and the kitchen area. He also argues "the evidence did not suggest" that he stabbed Garcia in her back before he inflicted her defensive sharp force injuries on her frontal areas, and that the sequence in which the back wound and the defensive knife-wounds were inflicted was "unknown." For these reasons, he argues, the prosecutor's argument was based on speculation, not evidence. We disagree.

First, and as discussed, the evidence supported a reasonable inference that defendant first used the knife to stab Garcia in her back. The forensic pathologist who performed Garcia's autopsy testified that her two fatal stab wounds to her back and to her neck occurred close together in time. The fatal knife injury to her back "cause[d] a

22

lot of hemorrhage into the chest," and this took "a little bit of time to happen." The pathologist also testified that all of Garcia's defensive injuries, including all of her sharp force defensive injuries, could have been inflicted after she was stabbed in the back and lying on the floor, trying to defend herself from the knife attack, although the pathologist could not "say for sure that that was the case." The fatal stab wound to Garcia's neck, where the knife was stuck, was clearly the last stab wound defendant inflicted.

Second, and because the evidence supported a reasonable inference that defendant first stabbed Garcia in her back, it was reasonable for the prosecutor to urge the jury to infer that defendant took some time to grab the knife from the kitchen area before he stabbed Garcia in her back with it. As the prosecutor argued, "If they had been in a brawl already and he just gabbed it [(the knife)], it would suggest that she was stabbed [in] the front. The fact that she was stabbed from the back suggests that there was more time taken to get that knife rather than just quickly." Indeed, the inference that Garcia was first stabbed in the back indicated that some period of time, if only moments, elapsed between the time defendant stopped beating Garcia with his fists and the time he grabbed the knife from the kitchen area and stabbed Garcia in the back with it. If he had grabbed the knife quickly, he likely would have stabbed Garcia in the front with it first.

To be sure, the jury was free to reject the prosecutor's interpretation of the evidence, particularly in light of the pathologist's testimony that he could not "say for sure" that defendant first stabbed Garcia in her back before he inflicted the sharp force defensive injuries to her frontal areas. (*Perez*, *supra*, 2 Cal.4th at p. 1126.) But the

23

prosecutor's argument was based on a reasonable interpretation of the evidence. Thus, there is no reasonable likelihood that the jury construed or applied the argument in the objectionable manner asserted by defendant—that is, as based on speculation rather than evidence. (*Morales*, *supra*, 25 Cal.4th at p. 44.)

## IV. DISCUSSION/SANITY PHASE ISSUES

During the sanity phase of the trial, the jury was instructed that, having found defendant guilty of the first degree murder of Garcia, it now had to determine whether defendant was legally insane when he committed the murder. (CALCRIM No. 3450.) The jury was instructed that defendant had the burden of proving that it was more likely than not that he was legally insane at the time of the murder, and he was legally insane if: "1. When he committed the crime, he had a mental disease or defect; and 2. Because of that disease or defect, he was incapable of knowing or understanding the nature and quality of his act or was incapable of knowing or understanding that his act was morally or legally wrong." (*Ibid.*)

The jury found that defendant was not legally insane at the time of the murder. A defense-retained forensic psychiatrist, Dr. Mendel Feldsher, and a court-appointed forensic neuropsychologist, Dr. Elsie Cheng, each testified that defendant was legally insane at the time of the murder. A third expert, court-appointed clinical psychologist, Dr. Teresa Fisher, testified that defendant was not legally insane at the time of the murder.

Defendant raises two claims of error concerning the questioning of the experts, Drs. Feldsher, Cheng, and Fisher. He first claims the trial court abused its discretion in

24

allowing the prosecutor, or the defense prophylactically, to elicit evidence that defendant had a 2001 misdemeanor conviction for domestic violence. Alternatively, he claims the trial court should have sanitized the 2001 conviction by limiting it to a 2001 misdemeanor conviction. Second, he claims the trial court erroneously allowed the prosecutor to ask the experts whether they had considered reports that there *may have been* a history of domestic violence between defendant and Garcia. Defendant additionally claims that the cumulative effect of these errors prejudiced the jury's determination that he was not legally insane at the time of the murder. We conclude that there was no individual or cumulative error in this context.

A. *The Trial Court's Rulings In Limine*

Before the sanity phase began, the trial court ruled that defendant's statements to Drs. Feldsher, Cheng, and Fisher concerning what he was experiencing at the time of the murder, including that he was hearing voices telling him to kill Garcia, were case-specific hearsay and, as such, inadmissible through the experts' testimony under *People v. Sanchez* (2016) 63 Cal.4th 665. The court ruled that the experts could testify that they based their opinions on *discussions* they had with defendant about what he was experiencing at the time of the murder—without relaying the specifics of defendant's statements to them.

The court next addressed the admissibility of defendant's prior criminal convictions, for two purposes: (1) impeaching defendant's sanity phase testimony, in the event defendant testified, and (2) questioning the experts about the bases of their opinions and the thoroughness of their investigations. Defendant did not testify. His

25

criminal history was as follows:  In May 2001, he committed and was convicted of misdemeanor domestic violence.  (Pen. Code, § 273.5.)  In September 2005, he was incarcerated for 13 days for misdemeanor driving under the influence.  (Veh. Code, § 23152.)  In 2007, he committed two felony offenses in Los Angeles:  a first degree residential burglary (Pen. Code, § 459) and an assault with intent to commit rape (Pen. Code, § 220, subd. (a)).  He was a fugitive following his 2007 crimes.  In 2009, he committed first degree criminal trespass in Arizona; he was convicted of that crime in 2010; he was then transferred to Los Angeles, where he was convicted of his 2007 offenses in 2010.  On December 1, 2010, he was sentenced to prison for his two 2007 felony offenses, and he was released on parole on May 14, 2016.

Defendant objected to the admission of any of his prior convictions for any purpose on relevancy grounds because, according to state prison records that the experts relied on in their reports, he did not report hearing voices until he was in prison in 2010.  Alternatively, he asked the court to "completely sanitize[e]" his prior convictions if they were admitted for any purpose.  The court ruled that the prosecution could impeach defendant's testimony, if any, with his 2001 conviction for misdemeanor domestic violence, his 2009 criminal trespass conviction, and his two 2010 felony convictions— without mentioning that one of the 2010 felony convictions was for assault with intent to commit rape.  The court thus "sanitized" defendant's section 220, subdivision (a), conviction for assault to commit rape, but did not sanitize his other convictions.  In ruling on the admissibility of the convictions for impeachment, the court reasoned that each of the crimes was of moral turpitude, each bore on defendant's veracity, and none

26

were too remote in time because defendant was not crime-free for any significant period after 2001; and, he was incarcerated from 2009 (in Arizona) through May 2016, fewer than 11 months before the murder.

The court also ruled that the experts could be questioned about whether they had considered—and, if so, the extent to which they investigated—defendant's prior convictions in forming their opinions of his legal insanity at the time of the murder. The court ruled that such questions were relevant to the thoroughness of the experts' investigations and, accordingly, to the weight that the jury could give to the experts' opinions. The court ruled that such questions were also relevant to the experts' assessments of defendant's credibility, that is, whether the experts believed what defendant told them about what he was experiencing at the time of the murder, including that he was hearing voices (auditory command hallucinations) telling him to kill Garcia.

B. *Sanity Phase Evidence*

1. Ms. P.'s Testimony

Defendant's sister, Ms. P., was three years older than defendant and grew up with him. She first noticed that defendant had psychological problems when she was 10 or 11 years old, and he would have been seven or eight years old. He would hit or punch himself or pull his hair when he was frustrated, and he would also bend over to pick up objects on the floor that were not there. He behaved in this way "many times," but no help was obtained for him. There were five children in the family, their mother was busy and had a third-grade education, and their father was not involved with the family. To Ms. P.'s knowledge, no school counselors, teachers, or social workers expressed

concern about defendant's mental health.  Ms. P. believed defendant was ashamed of his condition because he "never really wanted to talk about it," and the family "made so much fun of him growing up."

Defendant's mental condition worsened as he grew older.  Ms. P. first learned that he was hearing voices in late 2016, when he told her he was hearing voices, and the voices were telling him to "hurt himself."  At that time, he was seeing psychologists and taking medication, and he was controlling himself because of the medication.  He visited the P.'s home every weekend following his release from prison, around 10 and one-half months before the murder; but Ms. P. was not concerned for anyone's safety, including defendant's or Garcia's, due to defendant's mental condition.  When Garcia picked defendant up from the P.'s home the night before she was murdered, defendant seemed "a little irritated" "in general," but this was normal.  Ms. P. believed that defendant did "a lot better" when he was with the P.'s and his other family members in Los Angeles. It was a calming environment for him.  He and Garcia were boyfriend and girlfriend, but they were not married.  One time, defendant told his family that he had been diagnosed with schizophrenia, bipolar disorder, and severe depression.

2. Dr. Feldsher's Testimony

The defense hired Dr. Feldsher, a forensic psychiatrist who worked at Patton State Hospital, to conduct a forensic psychiatry evaluation of defendant in order to determine whether he was legally insane at the time of the murder.  Dr. Feldsher concluded that defendant was legally insane at that time of the murder because he did not know the wrongfulness of his actions at the time of the crime.  Dr. Feldsher reviewed defendant's

28

mental health records and other records, and interviewed him for 90 minutes on May 28, 2017.

Dr. Feldsher concluded that defendant had schizophrenia, which commonly causes auditory hallucinations and delusional beliefs. Schizophrenics have disorganized behavior driven by psychotic symptoms, and it is common for them to have a diminished range of emotional expression, inappropriate emotions, and a disconnected manner that is frequently mistaken for a lack of remorse. Schizophrenia varies "to a grave degree from person to person," but most commonly it is disabling. Schizophrenia is a form of psychosis, and psychosis "is basically having symptoms that are out of touch with reality," such as hearing and seeing things that are not there, or believing things that are not true. Defendant's symptoms of schizophrenia and psychosis included command auditory hallucinations and paranoid beliefs; a blunted, inappropriate affect; and a history of hallucinations for an extended period going back many years.

Symptoms of schizophrenia, or psychosis, can increase and decrease in intensity over time. Psychotic symptoms can also reach a very high intensity quickly, and then recede, so that the person does not know the wrongfulness of his actions in the moment but realizes it later.

A person's awareness that he is having auditory hallucinations or is experiencing psychosis does not mean that he can control his symptoms, and his symptoms can be significant even with medication. Command hallucinations can be so strong that the person feels compelled to act in accordance with them, even if he knows that the hallucinations are part of his illness.

29

Psychosis also affects a person's cognitive abilities; it makes it more difficult for the person to think things through, to understand consequences, and to avoid acting impulsively and with poor judgment. Prison inmates with schizophrenia are four times more likely to have convictions for violent offenses than inmates without schizophrenia. Reports from defendant's sister, Ms. P., that defendant would hit or punch himself as a child, especially when frustrated, provided more evidence defendant had a history consistent with serious mental illness. That he would pull at his hair and bend down to pick up nonexistent items suggested that he was exhibiting psychotic symptoms "even back then."

Defendant first reported having hallucinations in December 2010, while he was in state prison, and he was prescribed Risperdal. In 2011, he reported hearing voices. According to a May 3, 2011 note, defendant reported that he and his cellmate were not getting along and that defendant wanted to cut his wrists and hurt his cellmate, but defendant later reported that he was not feeling suicidal or homicidal. It was unclear to Dr. Feldsher which of defendant's versions was truthful. Defendant may have recanted his claims about feeling suicidal and homicidal in order to avoid being placed on suicide watch.

In any event, records from February 16 and March 6, 2014, when defendant was still in prison, showed that defendant again reported hearing voices or having auditory hallucinations. A note from November 2016, several months before the murder, was significant to Dr. Feldsher because it described defendant as "significantly impaired." It indicated that defendant could not tolerate being around other people due to the

30

magnitude of his paranoia and anxiety, and that his hallucinations and paranoia were at times indistinguishable from reality and disrupted his emotional stability.

On February 16, 2017, defendant went to a hospital where he again reported having command auditory hallucinations to end his life or hang himself. He reported that the voices he was experiencing were "aggressive and mean," and he had stopped working due to his symptoms. He was seeking treatment for what was described as "a crisis." He was not taking medication following his release from prison in May 2016. He had been prescribed Mirtazapine, an antidepressant, and Ziprasidone, an antipsychotic.

On March 9, 2017, defendant was sent to counseling by his parole outpatient clinic, where he reported having suicidal ideations and command auditory hallucinations. The notes from a March 9 therapy session stated that defendant was dealing with depression and suicidal thoughts and was "struggling with hallucinations." The records from February and March 2017 showed that defendant was experiencing "very significant" symptoms close in time to the murder, which was consistent with his report of having "significant" and "high intensity" symptoms at the time of the murder.

On March 26, 2017, the day of the murder, defendant was recorded telling police officers: " 'I kept telling the people I'm hearing voices. . . . It's fucking every psychologist, psychologist, psychiatrist. I'm hearing voices telling me to hurt myself and kill. Kill somebody. Well take this fucking medication and you'll feel better.' " Then, when the officers asked, " 'Did it help or no?' " defendant said, " 'No. Look what I did.' " According to Dr. Feldsher, defendant's statements to the officers showed that

31

he was angry with the people who were supposed to be treating him, but he was not showing remorse for the murder.

Defendant's actions following the murder also showed that he was not trying to get away with the crime. He refused his brother-in-law Mr. P.'s suggestion that he flee to Mexico, and he did not try to hide the murder scene. And, during a March 26, 2017 interview with a police detective, he very specifically described the symptoms that drove him to commit the murder, and the symptoms he described appeared to be genuine. It was also significant that defendant left the knife in Garcia's neck. Typically, a murderer who knows the wrongfulness of his actions will dispose of the murder weapon, but defendant was not trying to hide what he had done.

After the murder, on April 19, 2017, defendant again reported being depressed and that he was still hearing voices telling him to hurt himself or others. When Dr. Feldsher met with defendant on May 28, 2017, defendant said he had been hearing voices telling him to strangle his cellmate. During the May 28 meeting, defendant also said he was hearing voices telling him to kill or strangle the psychiatry resident whom Dr. Feldsher brought to the meeting.

Dr. Feldsher further explained that the murder was "psychosis driven." It was not driven by a "non-psychotic motive." Dr. Feldsher pointed out that there was "a lack of evidence" in the February and March 2017 records and elsewhere, that defendant had been "angry toward" Garcia or "upset about her." Even if there was such evidence, it would not change Dr. Feldsher's opinion, given the "mountain of evidence" that the murder was psychosis driven.

32

Defendant's 2001 misdemeanor domestic violence conviction, 2009 felony criminal trespass conviction, and 2010 burglary conviction also did not change Dr. Feldsher's opinion or make him believe that defendant was lying to him. It was "compelling" that defendant sought mental health treatment shortly before the murder and reported having very similar symptoms before the murder that he reported having to the police and to Dr. Feldsher.

On cross-examination, the prosecutor asked Dr. Feldsher whether it would change his opinion if he learned that three days before the murder,[4] defendant told his parole officer that he was depressed and angry over the situation with Garcia; he had kicked her out; he was worried about getting in trouble; his parole officer told him not to be around Garcia; and, if she showed up, defendant was to close the door and call the police. Dr. Feldsher responded that this information "would be a factor to consider" and would make him look very closely at whether there was evidence that, at the time of the crime, defendant acted out of anger toward Garcia. But Dr. Feldsher noted that defendant did not say anything negative about Garcia to the police when they interviewed him shortly after the murder. Defendant appeared to be angry about his symptoms but not angry with Garcia. Dr. Feldsher saw no evidence that defendant had a nonpsychotic motive for the murder. Rather, defendant acted based on his command auditory hallucinations.

---

[4] The prosecutor's question was mistaken to the extent it assumed that defendant met with his parole officer *three days* before the murder. The parole officer testified during the sanity phase that he met with defendant on March 13, 2017, which was 12 or 13 days before the March 25 to 26 murder.

When asked whether his opinion would change if he had information that there may have been prior domestic violence between defendant and Garcia, Dr. Feldsher said he believed that this information was in his report, but he did not investigate the information. Dr. Feldsher also knew that defendant had a 2001 domestic violence conviction, two felony convictions, including one for first degree burglary that occurred in 2007, and a 2009 criminal trespass conviction. He considered defendant's criminal history, but he did not review the police reports concerning, or independently investigate the circumstances surrounding, defendant's prior convictions. Dr. Feldsher saw no evidence that defendant was malingering, or feigning, his psychotic symptoms.

3. Dr. Cheng's Testimony

Dr. Cheng agreed with Dr. Feldsher that defendant had symptoms of schizophrenia and psychosis close in time to the murder, did not malinger or feign his symptoms, and was legally insane at the time of the murder. Defendant did not understand the wrongfulness of his actions at the time of the murder.

Dr. Cheng spoke with defendant about his criminal convictions, but the fact of the convictions did not change Dr. Cheng's opinion that the murder was psychosis driven. On cross-examination, Dr. Cheng acknowledged that she considered whether there "may have been" prior domestic violence between defendant and Garcia—in assessing whether defendant may have been malingering his psychotic symptoms—but she concluded defendant was not malingering. Dr. Cheng also asked defendant about his relationship with Garcia, but she did not independently investigate whether there was any domestic violence in the relationship.

34

### 4. Dr. Fisher's Testimony

Dr. Fisher concluded, contrary to Drs. Feldsher and Cheng, that defendant did not meet the legal criteria for being insane at the time of the murder, and that he was in fact sane at the time of the murder. Dr. Fisher agreed that defendant had psychosis, not otherwise specified, and she did not believe that defendant was malingering, but she did not believe that defendant had schizophrenia.

Dr. Fisher noted that defendant was very angry with Garcia shortly before the murder, and she considered this in concluding that defendant was sane. Defendant was also "very, very stable, mental health wise" throughout his stay in prison from 2010 to 2016, although he "struggled with medication compliance" following his release. His actions and statements following the murder—including his act of covering Garcia's body with a blanket and saying that he was contemplating suicide—showed he was aware of the wrongfulness of his actions. Dr. Fisher explained that "insanity is kind of the exception more than the rule. . . . [M]ost people, even those who are chronically mentally ill, are not necessary insane." In reviewing defendant's criminal history and the police reports concerning his criminal history, Dr. Fisher recalled seeing a "reference to somebody saying that there may have been a history of domestic violence" between defendant and Garcia. But Dr. Fisher did not independently investigate whether there had been any domestic violence between defendant and Garcia.

35

C. *Defendant's 2001 Misdemeanor Domestic Violence Conviction Was a Proper Subject of Inquiry for the Expert Witnesses*

Defendant claims the trial court abused its discretion in allowing the prosecution to ask the experts whether they considered defendant's 2001 domestic violence conviction in formulating their opinions and in assessing the credibility of defendant's statements. Alternatively, he claims the trial court abused its discretion in refusing to sanitize the 2001 conviction. We find no merit to these claims.

"A witness testifying as an expert may be cross-examined to the same extent as any other witness and, in addition, may be fully cross-examined as to (1) his or her qualifications, (2) the subject to which his or her expert testimony relates, and (3) the matter upon which his or her opinion is based and the reasons for his or her opinion." (Evid. Code, § 721, subd. (a).) Thus, "the scope of cross-examination of an expert witness is especially broad." (*People v. Lancaster* (2007) 41 Cal.4th 50, 105 (*Lancaster*).) "A party 'may cross-examine an expert witness more extensively and searchingly than a lay witness, and the prosecution [is] entitled to attempt to discredit the expert's opinion. [Citation.] In cross-examining a psychiatric expert witness, the prosecutor's good faith questions are proper even when they are, of necessity, based on facts not in evidence.' " (*People v. Wilson* (2005) 36 Cal.4th 309, 358 (*Wilson*).) "On appeal, we review the trial court's ruling on the scope of cross-examination for an abuse of discretion. " (*People v. DeHoyos* (2013) 57 Cal.4th 79, 123 (*DeHoyos*).)

The trial court did not abuse its discretion in allowing the experts to be asked whether they had considered defendant's 2001 misdemeanor conviction for domestic

violence in forming their opinions concerning defendant's legal insanity at the time of the murder.  As the trial court ruled, these questions were relevant to the thoroughness of the experts' investigations of defendant's history and, accordingly, to the weight that the jury could give to the experts' opinions concerning defendant's legal insanity at the time of the murder.  (See, e.g., *People v. Henriquez* (2017) 4 Cal.5th 1, 26-28 [no abuse of discretion in admitting evidence of the defendant's prior uncharged robbery and murder to impeach expert testimony that the charged murders were unplanned product of "intimate rage" rather than premeditated]; *People v. Rodriguez* (2014) 58 Cal.4th 587, 646-647; *People v. Hendricks* (1988) 44 Cal.3d 635, 641-642.)

Nor did the trial court abuse its discretion in refusing to "sanitize" the 2001 conviction by requiring counsel to refer to it solely as a misdemeanor conviction, rather than as a misdemeanor conviction *for domestic violence* in questioning the experts.  In refusing to sanitize the conviction, the trial court implicitly ruled that the probative value of the 2001 conviction for domestic violence outweighed its prejudicial effect, as such.  (Evid. Code, § 352.)  This was proper.

Under Evidence Code section 352, evidence " 'should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction.  In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose.' " (*People v. Doolin* (2009) 45 Cal.4th 390, 439.)  Based on the entire record, including defendant's entire criminal history and his

37

entire mental health history, the trial court reasonably determined that there was no substantial likelihood that the jury would have an emotional reaction to defendant's 2001 conviction. Nor would the jury use the conviction for an illegitimate purpose, rather than for the legitimate purpose of evaluating the thoroughness of the experts' investigations, the reasons for the experts' opinions, and the credibility of defendant's statements to the experts.

Defendant focuses on the inadmissibility of his 2001 conviction for impeaching his own testimony. He correctly points out that a witness's misdemeanor *conviction* is inadmissible to impeach the witness's testimony; only the conduct underlying the conviction is admissible for that purpose, subject to the trial court's discretion. (*People v. Wheeler* (1992) 4 Cal.4th 284, 297-300, superseded by statute on another ground, as stated in *People v. Duran* (2002) 97 Cal.App.4th 1448, 1460; *People v. Chatman* (2006) 38 Cal.4th 344, 373.) But defendant did not testify, and his 2001 conviction was not admitted to impeach his own testimony. Rather, the 2001 conviction was properly admitted on question of the thoroughness of the experts' investigations and the reasons for the experts' opinions, including the experts' assessments of the credibility of defendant's statements, to the experts and others, that he was hearing voices around the time of the murder, telling him to kill Garcia.

D. *The Information That There May Have Been Prior Domestic Violence Between Defendant and Garcia Was a Proper Subject of Inquiry for the Expert Witnesses*

Defendant also claims that the trial court prejudicially erred in allowing the prosecutor to ask the experts whether, in forming their opinions, they considered reports

that there *may have been* domestic violence between defendant and Garcia. Defendant complains that the prosecutor introduced no evidence that he had engaged in domestic violence with Garcia, before the murder, and that the prosecutor did not ask the court for permission to question the experts about any such "purported evidence." He argues that the prosecutor's questions concerning his prior domestic violence with Garcia were based on nothing more than speculation, and the trial court erred in failing to require the prosecutor to establish that the questions had a "non-speculative foundation." We find no merit to this claim.

1. Relevant Background

When defendant objected to the prosecutor asking Dr. Feldsher, who was the first expert to testify, whether his opinion would change if he had "information from someone that there may have been prior domestic violence with [Garcia] herself," Dr. Feldsher's response was, " I believe I have that in my report." The prosecutor then asked, "And [were] there any steps you took, having heard that, there may have been prior domestic violence between the two, to investigate that and look into the veracity and significance?" Defense counsel objected, and the court held a bench conference. Defense counsel told the court it was her understanding that the information the prosecutor was referring to came from Garcia's ex-husband, who reported that someone told him that Garcia may have killed someone. The court ruled that the prosecutor could ask Dr. Feldsher whether he had investigated "any of those claims," without specifically saying what the claims were. The prosecutor then asked Dr. Feldsher, "So having that information, did you do any investigation pertaining to that?" and Dr. Feldsher responded, "I did not."

39

The prosecutor later asked Dr. Cheng, "In your review of the police reports, do you recall seeing some reference to the fact that there may have been a history of domestic violence between the defendant and [Garcia]?" Dr. Cheng responded, "Yes." The prosecutor then asked Dr. Cheng, "Did you do anything to investigate or follow up on that history of domestic violence between the two of them?" Dr. Cheng responded, "In my inquiry with [defendant] in my evaluation, I asked about that, about their relationship." When asked whether she had independently investigated the matter by "talking to law enforcement or anybody who may have had more information about that," Dr. Cheng responded that she did not, and it was not her practice to investigate matters "beyond [the] documents" she received from the court.

On redirect examination, defense counsel asked Dr. Cheng about the "suggestion at some point in discovery that there had been, potentially been, a prior domestic violence situation" between defendant and Garcia, and whether Dr. Cheng took that information into account in forming her opinion. Dr. Cheng said that she had considered the information, and it did not change her opinion that defendant was legally insane at the time of the murder, although it made her think about whether defendant may have been malingering. She carefully analyzed whether he was malingering, however, and she concluded that he was not malingering.

The prosecutor subsequently asked Dr. Fisher whether, in reviewing defendant's criminal history, and in forming her opinion that defendant was not legally insane at the time of the murder, she recalled seeing a reference in a police report "to somebody saying that there may have been a history of domestic violence between the defendant and

40

[Garcia]." Dr. Fisher responded, "Yes," but she did not independently investigate the matter, and it was not her practice to do so.

2. Analysis

As noted, a trial court's ruling on the scope of cross-examination is reviewed for an abuse of discretion. (*DeHoyos*, *supra*, 57 Cal.4th at p. 123.) The scope of expert cross-examination is "especially broad" (*Lancaster*, *supra*, 41 Cal.4th at p. 105) and, " '[i]n cross-examining a psychiatric expert witness, the prosecutor's good faith questions are proper even when they are, of necessity, based on facts not in evidence.' " (*Wilson*, *supra*, 36 Cal.4th at p. 358.)

Contrary to defendant's claim that the questions were based on speculation, the prosecutor had a good faith, nonspeculative basis for believing that one or more police reports contained a reference to "someone saying that there may have been domestic violence between defendant and [Garcia]." Although the prosecutor did not specifically ask Dr. Feldsher whether he had seen such a reference, Drs. Cheng and Fisher confirmed that they had seen such a reference in police reports concerning defendant's criminal history. Thus, the prosecutor had a good faith, "non-speculative basis" for asking the experts whether they had considered the reference in forming their opinions about defendant's legal insanity.

E. *There Was No Cumulative Sanity Phase Error*

Defendant claims that the cumulative effect of the trial court's sanity phase errors prejudiced his Fourteenth Amendment right to a fair trial. But because we have found no

individual error, there is no basis for finding any cumulative error.  (*People v. Jablonski* (2006) 37 Cal.4th 774, 832.)

## V.  DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


FIELDS_____
J.

We concur:


McKINSTER_____
Acting P. J.


MILLER_____
J.